Martin J. JOHNSON, Sr.

v.

COTTONPORT BANK.

Nos. CIV. A. 00–2279, 00–2439.

United States District Court,
W.D. Louisiana,
Alexandria Division.

Dec. 28, 2000.

Dan B. McKay, Jr., Bunkie, LA, for appellant.

Lucy G. Sikes, Percy Smith et al., Alexandria, LA, John William Luster, Luster Conine et al., Natchitoches, LA, Paulin J. Laborde, Jr., Laborde Law Firm, Lafayette, LA, for appellees.

## DECISION ON APPEAL

LITTLE, Chief Judge.

Before this court is debtor Martin J. Johnson's appeal from the United States Bankruptcy Court. Johnson challenges (1) the 20 September 2000 order denying his objection to Cottonport Bank's proof of claim and granting Cottonport's motion to lift the automatic stay as to per capita deposits received from the Tunica Biloxi Tribe of Louisiana (Tribe), and (2) the 16 October 2000 order granting the Chapter 7 trustee's motion to turn over property, also affecting the per capita distributions. We affirm the bankruptcy court's orders.

### I.

On 16 March 2000 Johnson filed for relief under Chapter 7 of the United States Bankruptcy Code. On 20 September 2000 the bankruptcy court granted Cottonport's motion for relief from the automatic stay, allowing the bank to continue collecting a loan secured by an interest in Johnson's per capita distributions from the Tribe. On 16 October 2000 the court granted an order that additional per capita payments be to turned over to the Chapter 7 trustee as a part of the bankruptcy estate.

On 20 September 2000, the bankruptcy court heard testimony from the debtor and Doug Burke, the Tribe's chief financial officer. The per capita payments of about $1000[1] per month represent a portion of profits earned from the operation of Grand Casino Avoyelles, although the amount of the payments does not vary from month to month, and they are made regardless of how much money the casino brings in during the prior period. The payments are made to individuals the Tribe determines are members by birth. Federal taxes are withheld. No services need be performed in order to receive the money. There is no restriction on the right to pledge, assign, or otherwise transfer an interest in the payments. Other Tribe members have granted security interests in the payments, and have had them garnished. The payments cannot be inherited because they cease upon the member's death, although descendants are often able to claim their own payments.

After the hearing, the bankruptcy court presented oral findings. Upon the filing of the petition in bankruptcy, the debtor's legal and equitable property, broadly defined, became the property of the bankruptcy estate. The payments from the Tribe were not exempt from treatment as part of the bankruptcy estate under section 522, as the debtor's counsel conceded in argument. The bankruptcy court rejected Johnson's argument that under section 541(a)(6) the per capita payments were not part of the bankruptcy estate because they were his earnings.

The court found Cottonport could continue to claim payments made by the Tribe after Johnson's case commenced. Liens generally survive bankruptcy, under *Simmons v. Savell (In re Simmons)*, 765 F.2d

---

1. The briefs in the appeal state that the payments are about $800 per month, but before the bankruptcy court, they were said to be about $1000 per month.

547 (5th Cir.1985). Cottonport's security interest survived post-petition under section 552(b) of the Bankruptcy Code, rather than being invalidated under section 552(a) as an interest in property acquired after bankruptcy. Johnson did not otherwise challenge the validity of Cottonport's lien, for instance by presenting evidence that the lien was not properly perfected or was the product of fraud.

Johnson now asserts that the bankruptcy court erred in failing to apply 11 U.S.C. § 552 to void Cottonport's claim to the post-bankruptcy per capita payments, and also claims the per capita payments are not property and therefore cannot be the property of the bankruptcy estate.

## II.

■ We have jurisdiction under 28 U.S.C. § 158 to hear appeals from the final judgments, orders, and decrees of bankruptcy judges. Conclusions of law are reviewed de novo. *See Affiliated Computer Sys., Inc. v. Sherman (In re Kemp)*, 52 F.3d 546, 550 (5th Cir.1995). The bankruptcy court's findings of fact are subject to reversal only if they are clearly erroneous, that is if, considering all the evidence, we are left with the definite and firm conviction that a mistake has been made. *See id.* Arguments not raised before the bankruptcy court are waived upon appeal. *See Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1128 (5th Cir.1993).

## III.

### A.

Before the bankruptcy court, Johnson conceded Cottonport's security interest in the per capita payments was valid and properly perfected. He now contests that the payments made by the Tribe subsequent to the commencement of the bankruptcy proceeding are "proceeds, product, offspring or profits" of the original collateral, and asserts the subsequent payments are not subject to Cottonport's security

interest because he acquired them after commencement of the bankruptcy case.

■ Typically, security interests remain enforceable when the debtor enters bankruptcy. *See Simmons*, 765 F.2d at 555. Property acquired by the debtor after his bankruptcy case commences, however, is not subject to liens arising from security agreements entered before the commencement of the case. *See* 11 U.S.C. § 552(a). Subsection 552(b)(1) provides an exception; if a security agreement entered before the commencement of the case extends "to proceeds, product, offspring or profits" of the original collateral, then the security interest continues to apply to the proceeds and so on, even when they are acquired by the debtor or estate after the bankruptcy case begins. *See* 11 U.S.C. § 552(b)(1).

■ A discharge in bankruptcy releases the debtor from previously incurred debts, with some exceptions, allowing him to a make a fresh start. *See Local Loan Co. v. Hunt*, 292 U.S. 234, 244–45, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) (preventing enforcement of pre-application lien to wages earned post-application); *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 485 (5th Cir.1992). The bankruptcy code does not allow an enforceable lien to be created on property "not existent when the bankruptcy became effective or even arising from, or connected with, preexisting property, but brought into being solely as the fruit of the subsequent labor of the bankrupt." *Local Loan Co.*, 292 U.S. at 243, 54 S.Ct. 695.

■ When the debtor grants a security interest in the right to receive a stream of future payments, the security interest continues post-bankruptcy if the right to receive the payments existed prior to bankruptcy and the debtor need not do anything after bankruptcy to make them continue. *See Towers v. Wu (In re Wu)*, 173 B.R. 411, 413–15 (9th Cir. BAP 1994) (commissions debtor insurance agent received on post-petition policy renewals

were property of estate only to the extent the debtor's post-petition services were a not a prerequisite to payment); *Smoker v. Hill Assocs.*, 204 B.R. 966, 974–75 (N.D.Ind.1997) (security interest in renewal commissions survives bankruptcy where state law provides the commissions are not the agent's wages). This situation is distinguished from that in which the debtor's post-bankruptcy labor or assets generate payments the debtor may claim free of pre-petition security interests. *See In re Mintz*, 192 B.R. 313 (Bankr.D.Mass.1996) (post-petition profits of debtor's interest in partnership are not subject to pre-petition security agreement); *In re Rumker*, 184 B.R. 621 (Bankr.S.D.Ga.1995) (security interest did not attach to post-petition payments generated by post-petition labor, where right to compensation under pre-petition employment contract was assigned). Earnings attributable to invested capital, goodwill, accounts receivable, employee contracts and client relationships predating the petition are the property of the estate, not the debtor. *See Towers*, 173 B.R. at 413.

■■■ According to section 552(b)(1) of the bankruptcy code the security agreement and applicable state law determine whether Cottonport's security interest attaches to proceeds and distinguish the proceeds of preexisting collateral from after acquired property. *See In re Bumper Sales*, 907 F.2d 1430 (4th Cir.1990); *Mintz*, 192 B.R. at 318–19; *Rumker*, 184 B.R. at 624.[2]

■■■ Cottonport's security agreement describes the collateral as:

ANY AND ALL ACCOUNTS RECEIVABLE INCLUDING BUT NOT LIMITED TO ANY PER CAPITA PAYMENTS AND OR AND ANY FUNDS TO BE RECEIVED FROM THE TUNICA BILOXI TRIBE OF LA.

The financing statement contains the same description. Both go on to state that proceeds and other items related to the stream of payments are also subject to the security interest.

"Accounts" are defined as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." La. Rev.Stat. Ann. § 10:9–106. Johnson did not perform services or provide anything else in exchange for his payments, so the right to receive them is better described as a "general intangible,"[3] but otherwise, the description is accurate. Johnson did not simply transfer the individual payments to Cottonport, but granted the right to receive them in the future to the extent of the outstanding indebtedness. The security agreement's language clearly applies to the future payments as they are received. To hold otherwise would not make sense because Cottonport would lack a security of value.

Proceeds may take a number of forms but include "whatever is collected on, or distributed on account of, collateral." La. Rev.Stat. Ann. § 10:9–306(1)(a)(ii). This description applies to the money accounts receivable are converted into as they are paid. *See Terrebonne Fuel & Lube, Inc. v. Placid Ref. Co.*, 681 So.2d 1292 (La. App.1996) (not expressly applying section 10:9–306 but treating money received as proceeds of accounts). *See also In re Sunberg*, 729 F.2d 561 (8th Cir.1984) (benefits of United States Department of Agri-

---

**2.** Uniform Commercial Code (UCC) section 9–306 (here, La.Rev.Stat. § 10:9–306) and its definition of "proceeds" is often relevant in this context. Some courts hold that the legislative history of 11 U.S.C. § 552 supports a broader definition of proceeds than the UCC. *See, e.g., Bradt v. Woodlawn Auto Workers*, 757 F.2d 512 (2d Cir.1985). See discussion in *Mintz*, 192 B.R. at 318.

**3.** "[A]ny intangible personal property (including things in action) other than goods, documents, instruments, investment property, documents, instruments, investment property, rights to proceeds of written letters of credit, and money." La.Rev.Stat. § 10:9–106. Johnson does not challenge the sufficiency of the description of the collateral.

culture payment in kind program were a general intangible and assignment of rights applied to payments made after bankruptcy); *Franklin First Savings Bank v. Kizis*, 238 B.R. 89 (Bankr. M.D.Pa.1999) (security interest did not continue post-bankruptcy where security agreement applied to insurance commissions themselves, not to right to receive future commissions and payments as proceeds of the same, in contrast to *Smoker*); *In re Megamarket*, 207 B.R. 527 (Bankr. E.D.Ky.1997) (right to refund of insurance premiums is a general intangible, and the refund itself constitutes proceeds of the right); *Brever v. State Bank of Young America (In re Kohls)*, 94 B.R. 1006, 1009–10 (Bankr.D.Minn.1987) (payments themselves are proceeds of right to payment of dairy patronage credits which are accounts receivable or general intangibles). Proceeds may be "cash proceeds" in the form of money. *See* La.Rev.Stat. Ann. § 10:9–306(1)(b).

The sums Johnson received from the Tribe are the proceeds of the right to receive them, a right obviously transferred to Cottonport. The security interest applied to future payments and continues to apply to those made after Johnson's bankruptcy. To the extent that the payments are not proceeds because they are not created by a sale or exchange, they are still more closely related to and perhaps inseparable from the original collateral.[4] The per capita payments are not derived from Johnson's post-bankruptcy labor or assets; in fact he gave nothing in exchange for them at all. Therefore, the concerns present in cases such as *Local Loan Co.* are not present here. Nor can the value of the security fluctuate post-bankruptcy as with accounts receivable in a business, a

problem in other cases. *See, e.g., Terrebonne*, 681 So.2d at 1292.

Accordingly, Cottonport held a security interest in the per capita payments as they were made, both before and after Johnson's bankruptcy case commenced. Cottonport's security interest falls within 11 U.S.C. § 552(b)(1), and the bank may continue to collect the payments from the Tribe to the extent of the outstanding debt. Payments in excess of the debt are the property of the bankruptcy estate.

**B.**

 Next, we consider Johnson's contention that the per capita payments are not the property of the bankruptcy estate, because they are not property at all. 11 U.S.C. § 541(a)(1) provides that all of the debtor's legal and equitable property at the time the bankruptcy proceeding commences becomes the property of the estate. *See id.; United States v. Whiting Pools*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). State law determines whether a property interest exists upon commencement. *See Anderson v. Conine (In re Robertson)*, 203 F.3d 855, 859 (5th Cir.2000).

 Johnson's right to receive the monthly payments from the Tribe was a property right in existence when he filed for bankruptcy. Louisiana law recognizes intangible property, including an interest in the future income from a trust, a right to receive an annuity, and a share of ownership or the right to receive payments from an entity such as the Tribe. *See* La.Rev.Stat. Ann. § 10:9–106 (general intangibles); La. Civ.Code art. 461 (corporeals and incorporeals); La. Civ.Code Ann. art. 473 (West 2000) (incorporeal movables); La. Civ.Code Ann. art. 473 cmt. (e)

---

4. Johnson granted Cottonport a security interest in the stream of payments, rather than assigning them directly to Cottonport. There is some resemblance, however, to an assignment because it seems Johnson used the per capita payments to pay the debt, rather than simply to secure it should he be unable to pay it by other means. In an assignment, the assignee has a complete and present right to future payments and this interest survives bankruptcy. *See Smoker*, 204 B.R. at 971; *Thistlethwaite v. FDIC (In re Pernie Bailey Drilling Co., Inc.)*, 131 B.R. 53 (Bankr. W.D.La.1991); *Mahayna v. Poydras Ctr. Assocs.*, 693 So.2d 355 (La.App.1997).

(incorporeal movables and juridical entities); La. Civ.Code art. 475 (immovables); *In re Howard Marshall Charitable Remainder Annuity Trust,* 709 So.2d 662 (La.1998) (beneficiary's property interest in income from trust).

 Additionally, Johnson's right to receive the payments is freely transferable. There are no restrictions on his ability to assign the payments to another person. Other recipients of such payments use them to secure debts. They cannot be devised to someone else because they last only for the life of the Tribe member. This characteristic does not prevent the payments or the right to receive them from being recognized as property.

Johnson has not demonstrated that any exemption or exclusion available under state or federal law prevents the per capita payments from treatment as property of the estate. *See* 11 U.S.C. § 541(b) (exclusions); *Patterson v. Shumate,* 504 U.S. 753, 756, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) (exemptions). The bankruptcy court's finding that future payments from the Tribe were part of the bankruptcy estate was correct.

## IV.

For the reasons given above, we affirm the United States Bankruptcy Court's 20 September 2000 order denying Johnson's objection to the proof of claim of Cottonport Bank and granting Cottonport's motion to lift the automatic stay as to per capita deposits received from the Tunica Biloxi Tribe of Louisiana. We also affirm the bankruptcy court's 16 October 2000 order granting the Chapter 7 trustee's motion to turn over property, also relating the per capita payments.