In re Darrell Duane RUSSELL, Debtor.

**Darrell Duane Russell, Plaintiff,**

v.

**Fort McDowell Yavapai Nation, Defendant.**

Bankruptcy No. 02–06628–PHX–RJH.
Adversary No. 02–01215.

United States Bankruptcy Court,
D. Arizona.

May 15, 2003.

Ronald Rosier, Fountain Hills, AZ, for Fort McDowell Yavapai Nation.

Gary L. Thomas, Phoenix, AZ, for Darrell Duane Russell.

## OPINION DENYING NATION'S MOTION TO DISMISS

RANDOLPH J. HAINES, Bankruptcy Judge.

Debtor Darrell Russell received his chapter 7 discharge and then filed an adversary proceeding against Defendant Fort McDowell Yavapai Nation (the "Nation") to enforce the discharge. His complaint seeks to preclude the Nation from collecting his debt to the Nation by withholding his monthly entitlement to gaming revenues. The Nation moved to dismiss on the ground of tribal sovereign immunity,

and that motion has been briefed, argued and taken under advisement. For the reasons set forth below, the Court denies the Nation's motion to dismiss.

**Facts**

Russell is a tribal member of the Nation. In 1998, he obtained a $200,000 business loan from the Nation's Commercial Development Fund to finance his own collection business, which his application described as the "purchase of chattel paper." He committed to repayment of the loan by 60 equal monthly payments of $3,960 each from 1999 through 2004. The loan application, signed by Russell, stated that as "additional security for the loan, [Russell] shall assign any Per–Capita payments due to [Russell] at that time that the loan is officially in default, on a pro-rata basis, for such time as is necessary to repay the loan." The promissory note also referenced this provision as security for the note.

Russell's business apparently failed. He filed chapter 7 in May 2002 and obtained his discharge in September, 2002. He listed the business loan from the Nation as an unsecured [sic] debt in his Schedule F and included the Nation as a creditor on the master mailing list. The Nation in fact received notice of the bankruptcy filing and attended the first meeting of creditors, but did not file a proof of claim, object to the debtor's discharge, or object to the scheduling of its debt as unsecured. The Nation also received notice of the Debtor's discharge.

As a tribal member, Russell is entitled to a per capita distribution from the Nation's gaming revenues, which is currently approximately $2100 per month.[1] Each

---

1. The Nation notes now, but apparently did not object at the time, that the Debtor did not list his per capita income from the Nation either as an asset or as income, in his Schedules B and I and Statement of Financial Affairs, even though some bankruptcy courts have held such income to be property of the estate. *In re Kedrowski*, 284 B.R. 439, 451–52

month, before and after the discharge, the Nation has been deducting from these per capita payments approximately $1200 per month on account of the business loan.[2] Russell's adversary complaint seeks to have these deductions terminated on account of the discharge.[3]

**The Issue**

The Nation seeks dismissal of the adversary complaint on the ground the court lacks jurisdiction due to tribal sovereign immunity. The Debtor responds the sovereign immunity of "governmental units" is abrogated by 11 U.S.C. § 106(a) as to various sections of the Bankruptcy Code, including § 524(a)(2),[4] which provides that the discharge "operates as an injunction against" "an act, to collect, recover or offset any such [discharged] debt as a personal liability of the debtor." The Nation replies that it, and Indian tribes generally, are not specifically identified as among the governmental units to which that abrogation applies, because the definition of "gov-

ernmental unit" in Bankruptcy Code § 101(27) does not mention Indian tribes:

"[G]overnmental unit" means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States Trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

The Nation supports this argument by adding that any Congressional abrogation of tribal immunity "cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58–59, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (citations omitted).

■ Thus the issue is whether "domestic government" is an unequivocal expression that includes Indian tribes, or merely implies that.[5]

(Bankr.W.D.Wis.2002)(debtor's per capita distributions from gaming revenues constitute property of the estate); *Johnson v. Cottonport Bank,* 259 B.R. 125 (W.D.La.2000)(same).

2. The Nation also deducts federal taxes of approximately $480 per month, and payments for a house loan of approximately $400 per month, with the result that the Debtor nets zero pay each month. Russell claims his per capita distributions are his primary source of income, but does not explain how he survives on this income that has netted him nothing for at least the past several months. He also does not explain why he seeks to preclude the Nation from collecting on the business loan by deducting payments from his per capita distribution, but does not similarly object to the deductions for his home loan. Presumably the answer is that the home loan is also secured by the home, which he would lose if the payments were not made via these deductions, but the business loan is not similarly secured, or is no longer secured, by any other collateral.

3. The Complaint asserts that despite the Debtor's discharge, the Nation withholds the

Debtor's per capita payments in violation of the automatic stay of 11 U.S.C. § 362(a). But the trustee reported the estate was fully administered and the case was closed in January, 2003, so the automatic stay as to an act against property of the estate then terminated pursuant to § 362(c). The complaint prays that the Court order the Nation "to cancel the assignment and to cease taking money from the Debtor's Per Capita payments and to refund all money wrongfully taken by the [Nation] since June, 2002." The court will therefore treat it as a complaint asserting a violation of the discharge injunction under § 524.

4. Except as otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330.

5. The Debtor also may be arguing that the Nation waived its immunity by appearing at the § 341 first meeting of creditors. However a transcript of that appearance makes clear that the Nation merely appeared to state that it intended to continue collecting the Debtor's debt to the Nation by setoffs against his per

## Analysis

█ It is beyond debate that tribes enjoy sovereign immunity from private suit absent waiver or abrogation by Congress. That doctrine was announced in 1940,[6] withstood challenge in 1991,[7] and was recently reaffirmed and applied even off the reservation.[8] It is also beyond debate that Congress can abrogate tribal sovereign immunity. *Martinez*, 436 U.S. at 58, 98 S.Ct. 1670 ("This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress."); *Kiowa Tribe*, 523 U.S. at 759, 118 S.Ct. 1700 ("Congress 'has occasionally authorized limited classes of suits against Indian tribes' and 'has always been at liberty to dispense with such tribal immunity or to limit it'"), quoting *Potawatomi*, 498 U.S. at 510, 111 S.Ct. 905.

█ Any Congressional abrogation, however, "cannot be implied but must be unequivocally expressed." *Martinez*, 436 U.S. at 58–59, 98 S.Ct. 1670. Case law provides examples of purported waivers that have been found to be either by implication only or by equivocal expression.[9]

*Martinez* is an example of an attempt to imply an abrogation of sovereign immunity. It dealt with the Indian Civil Rights Act of 1968. The plaintiff sued the Santa Clara Pueblo for violation of its equal protection clause by denying tribal membership to children of female members who marry outside the tribe, but not to children of male members who do so. Because nothing in the Indian Civil Rights Act "purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief," the Court concluded that Congress had not abrogated tribes' sovereign immunity from such suits. 436 U.S. at 59, 98 S.Ct. 1670. It was not that a purported abrogation was equivocal, as there was not even an arguably equivocal attempt at abrogation. Rather, the argument for abrogation was solely based on implication, that Congress would not have imposed legal obligations on tribes to recognize their members' civil rights without also authorizing private suits to enforce those rights. In fact, the plaintiff's argument really rested on two inferences, because the Court also found that the Act implied no private right of action at all, not even against a tribal officer who was "not protected by the tribe's immunity from suit." *Id.* at 59, 98 S.Ct. 1670.[10]

capita distributions. Because the Nation did not seek or obtain any affirmative relief or other benefit from that appearance, and its appearance in this adversary proceeding has been limited to a special appearance to contest jurisdiction, there is no basis to suggest the Nation has waived its immunity. *Cf. Arizona v. Bliemeister (In re Bliemeister)*, 296 F.3d 858 (9th Cir.2002).

6. *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894 (1940)("These Indian tribes are exempt from suit without Congressional authorization.").

7. *Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991).

8. *Kiowa Tribe of Okla. v. Mfr. Techs., Inc.*, 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998).

9. Not all of these examples deal with tribal sovereign immunity, but the rule that abrogation of sovereign immunity must be unequivocal and not by implication applies generally to sovereign immunity. For example, when *Martinez* stated this rule as applicable to tribal immunity, it quoted it from a case dealing with the United States' immunity from suit. *Martinez*, 436 U.S. at 58–59, 98 S.Ct. 1670, quoting *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

10. In addressing the suit against an officer of the Pueblo, the Court recognized that a doctrine analogous to *Ex Parte Young* applies to

The best example of an "equivocal" abrogation of immunity is *United States v. Nordic Village, Inc.*, 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). In that case Justice Scalia explained why Bankruptcy Code § 106(c), the direct ancestor of the current § 106(a) prior to its amendment in 1994, failed to satisfy the "unequivocal expression" requirement—because "It is susceptible of at least two interpretations that do *not* authorize monetary relief." *Id.* at 34, 112 S.Ct. 1011 (emphasis in original). So according to the "plain meaning" of "unequivocal," to be equivocal the statute purporting to abrogate sovereign immunity must be susceptible of an alternative interpretation that does not do so.

 Here there is no purported abrogation of the first type, by implication. The Bankruptcy Code does not merely define the right—the right to a discharge like the right to equal protection in the Indian Civil Rights Act—but also the available remedies to enforce and protect that right, here § 524's express injunctive relief. So the availability of private judicial relief is not implied, but express. The next step is to determine whether the ability to assert it against a sovereign is also express or only implied. That is answered by the current § 106(a), which expressly abrogates sovereign immunity as to any governmental unit, with respect to the private judicial remedies that the Code provides.

"Governmental unit" is expressly defined to include the United States, a State, a foreign state, or "other foreign or domestic government." § 101(27). The Nation argues that because "there is no mention of Indian tribes" in that definition or elsewhere in the Code, it would only be by implication that they could be included, and sovereign immunity cannot be abrogated by implication.

Resolution of the Nation's argument hinges on the meaning of "implied" in the Supreme Court's admonition that abrogation of tribal immunity cannot be implied. As noted by the premier lexicographer of modern legal usage, there are three possible meaning of "imply," [11] but only the third, incorrect usage gives us any pause.

The first possible meaning is "to impute or impose on equitable or legal grounds." [12] This usage is unique to legal writing, and very common in legal writing, and is therefore is the most likely usage the Court intended. This is the usage when courts imply a contract, a trust, or a promise that was never actually made or even suggested. Perhaps the usage closest to the present context is when courts imply a private right of action in a statute. When they do so, they are not using the term in its ordinary English usage, because the

---

tribal sovereign immunity. It stated that a tribal officer "is not protected by the tribe's immunity from suit. See *Puyallup Tribe, Inc. v. Washington Dept. of Game*, [433 U.S. 165, 171–72, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977)]; cf. *Ex parte Young*, 209 U.S. 123[, 28 S.Ct. 441, 52 L.Ed. 714] (1908)." 436 U.S. at 59, 98 S.Ct. 1670. Consequently even if the Nation were immune here, the Debtor presumably could obtain equivalent injunctive relief (but not recovery of past withholdings) by an adversary proceeding against the Tribal officer who is responsible for distributing the per capita payments. *See, e.g., Duke Energy Trading and Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1051–55 (9th Cir.2001); *Goldberg v. Ellett (In re Ellett)*, 254 F.3d 1135 (9th Cir. 2001). See generally Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The Bankruptcy Discharge as Statutory Ex Parte Young Relief*, 76 AMER. BANKR. L.J. 461 (Fall 2002). However, the present adversary complaint names only the Nation as a defendant.

11. BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 423-25 (2d ed.1995); *accord* BLACK'S LAW DICTIONARY 758–59 (7th ed.1999).

12. GARNER, at 423–24.

court's holding is express rather than implied, and usually the court is not suggesting that the Congress or legislature consciously intended there to be a private right of action but only indicated it by implication. Instead, the court is imposing it because it is equitable to do so, just as a promise or a contract may be implied when a party acts to its detriment in reliance on another's statement or conduct. That is a particularly apt meaning in this context, because it means the Court is saying that abrogation of sovereign immunity cannot be implied in the same way a right of action might be implied even when the statutory language is silent on the subject. Under that meaning, however, there can be no argument that application of § 106(a) to tribes would be to imply an abrogation of sovereign immunity, because the language of § 106 is quite express. To apply § 106 to tribes would not be "to impute or impose" a legal right or obligation on which the statute is silent but is merely to apply the express words of the statute.

The second possible meaning is "to read into (a document)."[13] This means to infer a meaning that the author probably intended but is not found in the express words of the document.[14] Perhaps, for

example, the authors of the Constitution implied a right of privacy even though no words make that intention express. Again, however, it is clear that under this meaning the abrogation of sovereign immunity was not merely implied by Congress, because it is express in § 106. Concluding that §§ 101(27) and 106(a) include Indian tribes is not to conclude the authors implied something without making it express, but merely to apply what is expressly said. So under this meaning as well there is no violation of the Court's proscription against abrogation by implication in concluding that § 106 includes Indian tribes.

The third meaning, according to Mr. Garner, is simply erroneous, and that is "to infer."[15] Simply because it is erroneous may be sufficient reason to reject it, because the Supreme Court has made clear that the Bankruptcy Code is to be interpreted according to its "plain meaning,"[16] which would obviously preclude a conclusion that the words of the statute were used erroneously. Presumably the Court's rules for interpreting the Code are similarly to be interpreted according to the "plain meaning" of the words used by the Court. It is erroneous to use "imply"

---

**13.** *Id.* at 424.

**14.** Attempts have been made to argue that the authors of statutes implied an abrogation of sovereign immunity from other language in the statute, and such arguments have also been rejected by the Supreme Court, but under the rubric of requiring unequivocal expression rather than under the rubric of proscribing abrogation by implication. *See, e.g., Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)("[R]espondent relies on the pre- and post-enactment legislative history of the [Rehabilitation] Act and *inferences from general statutory language.* To reach respondent's conclusion, we would have to temper the requirement, well established in our cases, that Congress unequivocally express its intention

to abrogate the Eleventh Amendment bar to suits against the States in federal court.") (emphasis added).

**15.** GARNER, at 424–25. The distinction between this usage and the second is that in the second the *author* made the implication, whereas in this usage the reader made the implication, which in correct usage would be the reader's inference, not implication.

**16.** *See Dewsnup v. Timm,* 502 U.S. 410, 420, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (Scalia, J., dissenting); *Union Bank v. Wolas,* 502 U.S. 151, 163, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991)(Scalia, J., concurring); *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241–42, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

when "infer" is meant, so there is no reason to read *Martinez* as saying anything other than abrogation may not be implied, according to one of the two correct usages of that term already discussed, but not to prohibit a deduction from express statutory language.

But even if "implied" were meant to mean "inferred," a further analysis shows that the process of determining whether tribes are included within § 106's abrogation is not by inference, but by an altogether different process, deduction.

The Court has repeatedly held, as the Nation admits, that Indian tribes are domestic governments. "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Potawatomi*, 498 U.S. at 509, 111 S.Ct. 905, quoting *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). "Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." *Martinez*, 436 U.S. at 55, 98 S.Ct. 1670, quoting *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832). They are "separate sovereigns pre-existing the Constitution." *Martinez*, 436 U.S. at 56, 98 S.Ct. 1670. Indeed, if they were not sovereign governments they would not enjoy sovereign immunity at all.

So the abrogation of tribal sovereign immunity by §§ 101(27) and 106(a) can be stated as a simple syllogism: Sovereign immunity is abrogated as to all domestic governments. Indian tribes are domestic governments. Hence sovereign immunity is abrogated as to Indian tribes.

The syllogism, of the classic form—All men are mortal; Socrates is a man; hence Socrates is mortal—is one of the two forms of reasoning. The other is induction, drawing implications or inferences from examples. According to Aristotle, these are the *only* two methods of reasoning, or persuasion by proof:

> With regard to the persuasion achieved by proof or apparent proof: just as in dialectic [logic] there is induction on the one hand and syllogism or apparent syllogism on the other, so it is in rhetoric. The example is an induction, the enthymeme is a syllogism, and the apparent enthymeme is an apparent syllogism.... Every one who effects persuasion through proof does in fact use either enthymemes or examples: there is no other way.... When we base the proof of a proposition on a number of similar cases, this is induction in dialectic, example in rhetoric; when it is shown that, certain propositions being true, a further and quite distinct proposition must also be true in consequence, whether invariably or usually, this is called syllogism in dialectic, enthymeme in rhetoric.[17]

Implication and inference are the rhetorical versions of induction, drawing conclusions from examples. For example, if the last phrase were eliminated from § 106(a), one might draw the inference that because sovereign immunity is expressly abrogated as to the United States, the States, the Commonwealths, the Districts, and foreign governments, Congress must have intended to abrogate it as to all governments. That would be reasoning by implication or inference. While that might be equally as sound, and in fact how all new knowledge is achieved, it nevertheless

---

17. ARISTOTLE, RHETORIC, Book I, chapter 2, at 1356a–1356b (W. Rhys Roberts trans., Random House, Inc. 1984).

retains the possibility for error.[18] The Court may well have intended to proscribe this method of concluding that there has been an abrogation of sovereign immunity, but the Court has not similarly proscribed that conclusion when reached by deduction.

But because the statute expressly abrogates sovereign immunity as to all domestic governments, the statute applies to Indian tribes by deduction rather than by implication, so the conclusion is not proscribed by the Court's limitations. In other words, the proscription against abrogation by implication does not require the listing or naming of each government as to which it applies so long as they are unequivocally identified by the statute. Indeed, if the Nation's argument here were to be adopted, then Arizona could similarly argue that § 106(a) does not apply to it because it is not mentioned. But § 106(a) does apply to Arizona by the exactly the same logical process that it applies to the Fort McDowell Yavapai Nation: Sovereign immunity is abrogated as to States, Arizona is a state, therefore sovereign immunity is abrogated as to Arizona.

That leaves the other possibility, that the abrogation is equivocal, susceptible of more than one meaning, in its application to Indian tribes. But the Nation has not suggested, either in its memoranda or at oral argument, any possible other meaning

of "domestic government" that would not include Indian tribes. Indeed, since the meaning of "or other foreign or domestic government" cannot include the United States, or a State, Commonwealth, Territory or District, or a municipality, or a foreign state, or an agency, department or instrumentality of any of them, because they are all expressly mentioned, it is difficult if not impossible to come up with any possible meaning for "other domestic government" *except* Indian tribes. Without another reasonable plausible alternative meaning, the abrogation of sovereign immunity as to all domestic governments is not equivocal. It could hardly be more absolute.[19]

It remains to test this analysis by the case law.

The Ninth Circuit has "assume[d], without deciding, that Indian tribes are 'governmental units' for the purposes of § 106." *Richardson v. Mt. Adams Furniture (In re Greene)*, 980 F.2d 590, 597 (9th Cir.1992). That case ultimately concluded, on the basis of *Nordic Village*, that the pre–1994 version of § 106 did not abrogate sovereign immunity against a money judgment. That conclusion is moot after the 1994 amendment to § 106, which made express that the abrogation of sovereign immunity included "an order or judgment awarding a money recovery." § 106(a)(3). *Mitchell v. Franchise Tax Board (In re*

---

**18.** As Bertrand Russell pointed out, we usually know the truth of the major and minor premises of a deduction only by induction. "We shall all agree that Mr. Smith (say) is mortal, and we may, loosely, say that we know this because we know that all men are mortal. But what we really know is not 'all men are mortal'; we know rather something like 'all men born more than one hundred and fifty years ago are mortal, and so are almost all men born more than one hundred years ago.' This is our reason for thinking that Mr. Smith will die. But this argument is an induction, not a deduction. It has less

cogency than a deduction, and yields only a probability, not a certainty; but on the other hand it gives *new* knowledge, which deduction does not." Bertrand Russell, A HISTORY OF WESTERN PHILOSOPHY 199 (Simon and Schuster 1945).

**19.** *Cf. Choteau v. Burnet, Comm'r of Internal Revenue*, 283 U.S. 691, 51 S.Ct. 598, 75 L.Ed. 1353 (1931)(the language of the Internal Revenue Act of 1918 that made it applicable to "every individual" was broad and explicit enough to include Indians).

*Mitchell),* 209 F.3d 1111, 1118 (9th Cir.2000)("Congress has clearly expressed its intent to abrogate state sovereign immunity in § 106(a)"); *Elias v. United States (In re Elias),* 218 B.R. 80, 83 (9th Cir. BAP 1998) ("It is clear from the text that § 106(a) 'manifests the requisite intent to abrogate.' "), *aff'd,* 216 F.3d 1082 (9th Cir.2000).

At least three bankruptcy court opinions have concluded, arguably in dictum, that § 106 does abrogate sovereign immunity as to Indian tribes as "domestic governments." *Warfield v. The Navajo Nation (In re Davis Chevrolet, Inc.),* 282 B.R. 674, 683 (Bankr.D.Ariz.2002); *Turning Stone Casino v. Vianese (In re Vianese),* 195 B.R. 572, 576 (Bankr.N.D.N.Y.1995); *In re Sandmar Corp.,* 12 B.R. 910 (Bankr. D.N.M.1981).[20] The Nation does not address *Warfield,* but argues that the conclusion in *Vianese* was dictum because the tribe there had filed a proof of claim and therefore waived its immunity by virtue of § 106(b), so the analysis of waiver pursuant to § 106(a) was unnecessary to the result. While it is true that both *Warfield* and *Vianese* rested on § 106(b) rather than on § 106(a) as we must here, it is also the case that waiver pursuant to § 106(b) expressly applies only to governmental units. So the courts' findings of waiver pursuant to that section necessarily hinged on a conclusion that the tribe qualified as a "governmental unit" as defined and used throughout § 106. In fact, *Warfield* made this conclusion explicit, in similarly concluding that tribes are included in § 106 as "other domestic government." 282 B.R. at 683 n. 5.

There are at least two cases to the contrary. An Iowa bankruptcy court concluded that § 106 would apply to Indian tribes only by inference, and therefore run afoul of the Supreme Court's proscription of abrogation by implication:

> The Code makes no specific mention of Indian tribes. Unlike States and foreign governments, Indian tribes are not specifically included in the § 101(27) definition of "governmental unit." In order to conclude Congress intended to subject Indian tribes to suit under the Code, the Court would need to infer such intent from language which does not unequivocally and unambiguously apply to Indian tribes. Considering the Supreme Court's pronouncements on tribal sovereign immunity, such an inference is inappropriate.

*In re Nat'l Cattle Cong.,* 247 B.R. 259, 267 (Bankr.N.D.Iowa 2000).

That analysis, however, did not consider the language "or other foreign or domestic government," nor whether Indian tribes would be included in the scope of the statute by deduction from those terms rather than by inference from the prior examples. Because *National Cattle Congress* did not consider the analysis made here, it does not demonstrate any weakness in the present analysis.

A Washington district court employed similar reasoning in concluding that § 106 does not abrogate tribal sovereign immunity:

> The Court finds that the Bankruptcy Code does not meet the *Martinez* standard. There is no express mention of Indian tribes anywhere in the Bankruptcy Code, and the Court could only infer that an Indian tribe is a "domestic government" under the definition of governmental unit. For these reasons, the Court concludes that Congress has not

---

**20.** Because *Sandmar* was decided prior to *Nordic Village, Kiowa Tribe* and the 1994 amendment to § 106, its precedential value may be questionable so it is not further discussed here.

unequivocally expressed clear legislative intent to abrogate tribal sovereign immunity pursuant to the Bankruptcy Code.

*Confederated Tribe of Colville Reservation Tribal Credit v. White (In re White),* 1996 WL 33407856, at \*3 (E.D.Wash.1996), *aff'd on other grounds,* 139 F.3d 1268 (9th Cir. 1998).

Again, the court failed to note the distinction between implication and deduction, and that the Supreme Court has only proscribed the former as a method of deriving an abrogation of sovereign immunity, not the latter. It similarly failed to demonstrate what is even potentially equivocal about "domestic government," in that it failed to suggest an alternative meaning that would not include Indian tribes. Again, therefore, nothing in this opinion suggests any weakness in the present analysis. On appeal, the Ninth Circuit affirmed on grounds of waiver and "express[ed] no view on whether an Indian Tribe is a 'governmental unit' for purposes of § 106(a) or (b)." 139 F.3d at 1270 n. 1.

Finally, the Nation also argues that because other statutes that abrogate tribal sovereign immunity do so by express mention of Indian tribes, Congress would have similarly made an express mention of Indian tribes in § 106 if it had intended to abrogate their immunity. The Nation notes, for example, that the Eighth Circuit found that Congress abrogated tribal sovereign immunity as to suits under the Resource Conservation and Recovery Act of 1976 (RCRA) because it permitted suits against "any person," and defined "person" to include municipalities, and defined "municipalities" to "include 'an Indian tribe or authorized tribal organization.'" *Blue Legs v. United States Bureau of Indian Affairs,* 867 F.2d 1094, 1097 (8th Cir.1989); *accord, Washington, Dep't of Ecology v. United States Envtl. Prot. Agency,* 752

F.2d 1465, 1469 (9th Cir.1985). Similarly, the Eighth and Ninth Circuits found an abrogation of tribal sovereign immunity in the Hazardous Materials Transportation Uniform Safety Act of 1990, because it also expressly mentioned "Indian tribe." *Public Service Co. of Colo. v. Shoshone–Bannock Tribes,* 30 F.3d 1203 (9th Cir.1994); *Northern States Power Co. v. The Prairie Island Mdewakanton Sioux Indian Cmty.,* 991 F.2d 458 (8th Cir.1993). And the Tenth Circuit found an abrogation of tribal sovereign immunity in the Safe Drinking Water Act, because it authorized actions against "persons," which were defined to include "municipalities," which were defined to include "an Indian tribe." *Osage Tribal Council v. United States Dep't of Labor,* 187 F.3d 1174 (10th Cir.1999).

But that is a rather weak inductive argument, that because Congress abrogated tribal sovereign immunity three times by mentioning Indian tribes, that must be the only way that Congress drafts such legislation. And however powerful the induction might become through a multitude of examples, it fails to demonstrate any fallacy in the deduction made above, or any equivocation in the term "domestic government" as it is found in § 106.

The Eleventh Circuit recently adopted an argument similar to the Nation's in concluding that the Americans With Disabilities Act did not abrogate sovereign immunity as to tribes:

These two statutes—the (now repealed) HMTUSA and the RCRA—are not before us.... We note, however, that the wording of these laws at least implies that Congress comprehends the need to address Indian tribes specifically and individually when it describes the means of enforcing statutorily created rights through judicial action. When we compare Title III of the ADA to the HMTUSA and the RCRA, the absence of *any*

reference to Indian tribes in the former statute stands out as a stark omission of any attempt by Congress to declare tribes subject to private suit for violating the ADA's public accommodation requirements.

*The Fla. Paraplegic Ass'n, Inc., v. Miccosukee Tribe of Indians of Fla.,* 166 F.3d 1126, 1132 (11th Cir.1999)(emphasis in original).

The conclusion of *Florida Paraplegic* is not applicable here, however, because the ADA does not contain a provision similar to §§ 101(27) and 106 that abrogates sovereign immunity as to all "domestic governments." To the contrary, the ADA expressly only abrogates state sovereign immunity under the Eleventh Amendment, not the common law sovereign immunity of other governmental entities. The Eleventh Circuit also relied on this glaring omission to conclude that the ADA did not abrogate tribal sovereign immunity:

One other provision of the ADA provides further support for our conclusion that Congress did not intend to abrogate sovereign immunity with respect to Indian tribes. Section 12202 states:

A State shall not be immune under the eleventh amendment . . . from an action in Federal or State court of competent jurisdiction for a violation of [any portion of the ADA] . . . .

42 U.S.C. § 12202. This provision demonstrates Congress's full understanding of the need to express unambiguously its intent to abrogate sovereign immunity where it wishes its legislation to have that effect. . . .

That it chose not to similarly include an abolition of the immunity of Indian tribes is a telling indication that Congress did not intend to subject tribes to suit under the ADA.

*Id.* at 1133.

The Eleventh Circuit's latter conclusion appears to be sound. Not only does the ADA fail to contain any words that, by deduction, could be construed to abrogate tribal sovereign immunity, but the doctrine of *expressio unis* would even preclude an inference of that intent, given the express abrogation as to States and the Eleventh Amendment only. Consequently there is no need to resort to its initial conclusion that Congress must "address Indian tribes specifically and individually" in order to abrogate their immunity, which in any event seems to be a significant expansion on the Supreme Court's requirements.

### Conclusion

The term "other foreign or domestic government" in § 101(27) unequivocally, and without implication, includes Indian tribes as "governmental units." Section 106(a) unequivocally, and without implication, abrogates sovereign immunity as to governmental units, including Indian tribes, with respect to application of the enumerated sections of the Bankruptcy Code, including § 524's injunctive effect of the discharge. Consequently the Nation's motion to dismiss on grounds of sovereign immunity must be denied.

This does not, however, mean that Debtor will prevail. As has already been noted, some courts have held that tribal members' rights to receive per capita gaming revenues are property of the estate, rather than earnings from individual services that are excluded from the estate by virtue of § 541(a)(6).[21] If the postpetition monthly payments are the

---

21. *See* note 1, *supra*. None of the facts presented by either party here suggests that the Nation's per capita payment program is different in any material respect from that at issue in *Kedrowski,* so the court will assume the same analysis applies here.

proceeds of such property interest, in which the Debtor had granted a security interest prepetition, then the Nation's security interest would not be cut off by virtue of § 552(b)(1). *Johnson v. Cottonport Bank,* 259 B.R. 125, 130 (W.D.La. 2000). And if the Nation's lien therefore survived the petition, it also survived the discharge, because a chapter 7 discharge does not invalidate a lien. "[I]n cases where the creditor holds a secured interest in property subject to a scheduled debt, a discharge extinguishes only the personal liability of the debtor," so the lien rides through unaffected. *Garske v. Arcadia Fin., Ltd. (In re Garske),* 287 B.R. 537, 542 (9th Cir. BAP 2002), quoting *Johnson v. Home State Bank,* 501 U.S. 78, 80, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991)("Notwithstanding the discharge, the secured creditor's right to proceed against [the debtor] in rem survived the Chapter 7 liquidation."). Moreover, since the Nation is owed on the loan and owes Debtor the per capita payments, both on account of prepetition transactions, it may have additional protections under § 553 that also survive the discharge.

Unfortunately although the Nation made these arguments and cited some of these authorities for them, it did so only in its reply, so Debtor did not have an opportunity to respond to them, and they were not the basis of a Rule 12(b)(6) motion to dismiss. Consequently these issues must await another day and another motion.